**Ron D. LEWIS, Appellant,**

v.

**CHAROLAIS CORPORATION; and Bituminous Resources, Inc., Appellees.**

**No. 1996–CA–001260–MR.**

Court of Appeals of Kentucky.

April 30, 1999.

Case Ordered Published by Supreme Court June 7, 2000.

Discretionary Review Denied by Supreme Court June 7, 2000.

---

40. *Id.*

Kenneth W. Humphries, Hopkinsville, for Appellant.

William G. Deatherage, Jr. Jack N. Lackey, Jr., Hopkinsville, for Appellees.

Before: EMBERTON, KNOPF and KNOX, Judges.

## OPINION

EMBERTON, Judge.

Ron D. Lewis appeals from a judgment based upon a jury verdict denying recovery on his claim for damages for the destruction of a stream flowing across his

property; and, which awarded appellees, Charolais Corporation and Bituminous Resources, Inc., $25,000 on their claim that Lewis had engaged in a campaign of harassment against them. Lewis alleges in this appeal: (1) that the trial judge submitted incorrect instructions on the issue of loss of the stream; (2) that the jury was unduly prejudiced by improper statements by counsel for Charolais; (3) that the trial judge erred in awarding costs to Charolais; (4) that the trial judge erred in refusing to allow appellant's expert to testify as to the cost of remediation; and (5) that the decision of the jury on Charolais' harassment claim was "clearly erroneous." Finding no reversible error in any of the contentions advanced in this appeal, we affirm.

The action precipitating this appeal commenced when Lewis lodged a complaint in the Christian Circuit Court alleging, among other things, that Charolais had destroyed a stream running across his land. The evidence adduced at trial indicates that in 1990, Don and Betty Bowles, the sole shareholders of Charolais, obtained a permit to conduct surface coal mining and reclamation activities on property near the community of White Plains, Kentucky. Lewis, who owns a parcel of real property near the mining site, contacted a Charolais employee with some concerns he wanted the company to address as the mining operations began to approach his property. At a meeting with Junior Durall, the mining site supervisor, Lewis expressed concern that the proposed mining and reclamation activity would destroy a stream running across his property. Durall testified that Lewis feared that the reclamation of an old strip pit as called for in the permit would cause the stream to run dry. Durall stated that Lewis wanted to acquire a parcel of the Bowleses' property that lies between the mining site and his property and that Lewis intimated that if the Bowleses would simply give him that property he would not complain about the proposed mining and reclamation activities.

Don Bowles testified that within a few days of the meeting with Durall, Lewis came to the Charolais scale house to discuss acquiring the property. Bowles explained that transferring the property at that point would not be possible because of complications with the permit process. Lewis returned a few days later and offered Bowles $100 per acre for the land. Bowles stated that Lewis made it clear that refusal of that offer would cost him "tenfold."

Shortly after the meeting, Lewis began filing complaints with the Department of Surface Mining Reclamation and Enforcement and with the Federal Office of Surface Mining. The environmental services manager for DSMRE testified as to the content of the complaints and as to the disposition by DSMRE. Of the thirty-some complaints Lewis filed, the DSMRE noted violations on only two occasions and both were later dispensed with, one overturned by an Administrative Law Judge and the other modified by the DSMRE. The DSMRE manager also testified that Charolais was considered by his office to be a "good" company in that they had received numerous national and local awards for reclamation work and that they were known to quickly respond to complaints and requests by the DSMRE.

After hearing considerable testimony as to the nature of the "stream" running across Lewis's property, the jury found that the source of the stream was pit discharge from rain and surface water runoff which, under the instructions, was tantamount to a verdict for Charolais. Lewis's primary argument in this appeal is that the instructions on loss of water are erroneous both under the common law and statutory law of this Commonwealth. We disagree.

The instructions submitted on the water loss claim first required the jury to determine whether, prior to the mining activity, there was a stream of water flowing across the properties of Charolais and Lewis in a

quantity sufficient for use in agricultural purposes. If the answer to that interrogatory was "yes," the jury was then asked to determine whether the source of the stream was a perched aquifer as Lewis maintained or pit discharge from rain and surface water runoff as claimed by Charolais. On conflicting evidence the jury concluded that the source of the stream was pit discharge from rain and surface runoff. Because the jury was directed to proceed to consider whether the mining activities unreasonably diminished the flow of water in the stream only if it concluded that the source of the stream was a perched aquifer, the inquiry into the cause of any diminution in the flow of the stream ended with the determination that the source was pit discharge.

■ Lewis contends in this forum that the interrogatory concerning the source of the water should not have been given because the source of the water is irrelevant. Citing KRS Chapter 151, he maintains that every source of water to any stream or ditch is absolutely protected by Kentucky law, abrogating the common law in this area. Thus, Lewis contends that whether the source of the water was a perched aquifer or pit discharge from rain and surface runoff the jury should have resolved the question of responsibility for its destruction. We disagree.

■ Our review of the framework set out in KRS Chapter 151 convinces us that it is not intended to supplant the common law but rather establishes a mechanism for the management of groundwater "for the health, welfare, and economic prosperity of all citizens." In other words, the legislature created a comprehensive process for the regulation of water use and placed the Natural Resources and Environmental Protection Cabinet in charge of enforcement. Kentucky Revised Statute (KRS) 151.110(2); 151.125; and 151.182. Thus, being regulatory in nature, Chapter 151 does not, as Lewis suggests, create a private right of action, but simply arms the Cabinet with authority to issue permits, promulgate regulations and enforce its orders through the institution of court actions. The common law, on the other hand, directs itself to property owners' rights to water in accordance with physical characteristics of the body of water and is therefore the appropriate guide for our review.

Examining, in light of well-established case law, Lewis's contention that the jury's inquiry into liability for his loss of water ends with the determination that prior to the mining activity there was a "stream of water" flowing across his property, we conclude that a determination as to the source of the stream is critical. Contrary to Lewis's position, both the statutes and the case law differentiate between established streams and water courses and diffuse surface water. After hearing extensive expert and lay testimony as to the source of the water and the nature of the stream across Lewis's property, the jury determined that the origin of the flow was pit discharge from rain and surface runoff. Because there was evidence of substance supporting the jury verdict, the trial judge did not err in refusing to set it aside.

Nor do we believe that it was error to submit instructions under which a finding that the source was pit discharge ended the inquiry into responsibility for destruction of the stream. This case falls squarely within the rationale set out in *Withers v. Berea College*, Ky., 349 S.W.2d 357 (1961), in which the court held that interference with surface water before it enters into a natural watercourse is not actionable:

> Both at common law and under KRS 262.680 [Water as Natural Resource; Control and Regulation; Exceptions— Repealed] it is clear that the owner of land may collect and use as he pleases surface water that has not entered into a natural stream or definite body such as a lake or pond. See 56 Am.Jur. 548 (Waters, Sec.66); 93 C.J.S. Waters, Sec. 113, p. 802.

'The owner of the upper estate may withhold such water, and prevent it from reaching the lower land. Such water belongs absolutely to the owner of the land on the surface of which it is found. No doubt, all the water falling from heaven, and shed upon the surface of a hill, at the foot of which runs a brook, must, by the natural force of gravity, find its way to the bottom and so into the brook; but this does not prevent the owner of the land on which it falls from dealing as he may please and appropriating it. He cannot, it is true, if the water has arrived at and is flowing in, some natural channel already formed. But he has a perfect right to appropriate it before it arrives at such channel.' *Jones on Easements,* as quoted in dissenting opinion of Judge Burnam in *Stith v. Louisville & N.R. Co.,* 1900, 109 Ky. 168, 58 S.W. 600, 603, 22 Ky. Law. Rep. 653.

The *Withers* court goes on to hold that the plaintiff has the burden of proving that the flow of water prior to arriving at the defendant's property "had a bed, banks and a current of water flowing at those times when the streams of the region habitually flow, these characteristics being essential to the substantial existence of a natural watercourse." 349 S.W.2d at 358. Thus, Lewis had to prove that the water had become part of a natural water course *prior to its entry onto the Charolais property* or that the source of the flow traversing his property was a perched aquifer rather than surface runoff. After the jury determined that the source of water on Lewis's land was pit discharge and surface runoff, the matter was concluded because under the common law Charolais was entitled to configure its collection pit as it saw fit without subjecting itself to liability for interference with the surface runoff.

Similarly, in *Green v. City of Williamstown,* 848 F.Supp. 102 (E.D.Ky.1994), the court concluded that the fact a landowner had created an artificial lake on his property conferred no rights upon adjoining landowners in the continued maintenance of a certain water level for their benefit. In a footnote on page 106 of that opinion, the court cited the following passage from 78 Am.Jur.2d, Waters, Sec. 205:

Ordinarily, the proprietor of a dam has an unqualified right to remove, alter, or abandon it where the rights of other persons are not affected by such actions. Moreover, the rule supported by most courts is that the mere fact that one has used or improved his property with reference to the artificial condition created by the maintenance of a dam by another, so that he would suffer loss or inconvenience by the removal or alteration of such dam, confers upon him no right to the continued maintenance thereof for his benefit, or, at least, imposes upon the proprietor of a dam no affirmative obligation with respect to such maintenance. It has been held that in the absence of any covenant to keep a lake at a certain level by the maintenance of a dam, the owner of the dam may abandon and destroy it.

We find no legitimate distinction between the alteration of the pit on Charolais' property and the destruction of an artificial lake discussed in *Green.* Charolais was not required to maintain the pit in any certain way solely to benefit Lewis and alteration of the pit discharge did not therefore give rise to a claim for damages.

Lewis also claims that KRS 151.210 confers upon him rights which are superior to that of Charolais:

(1) Any owner of land contiguous to public water shall at all times have the right to the use of water therefrom to satisfy his needs for domestic purposes, which shall include water for household purposes, drinking water for poultry, livestock and domestic animals. *The use of water for such domestic purposes shall have priority and be superior to any and all other uses.* (Emphasis added).

We are convinced, however, that the statutory definition of "public water" contained in KRS 151.120 clearly refutes Lewis's claim:

(1) Water occurring in any stream, lake, ground water, subterranean water or other body or water in the Commonwealth which may be applied to any useful and beneficial purpose is hereby declared to be a natural resource and public water of the Commonwealth and subject to control or regulation for the public welfare as provided in KRS Chapters 146, 149, 151, 262, and 305.029 and 433.750 to 433.757.

(2) Diffused surface water which flows vagrantly over the surface of the ground shall not be regarded as public water, and the owner of the land on which such water falls or flows shall have the right to its use. Water left standing in natural pools in a natural stream when the natural flow of the stream has ceased shall not be regarded as public water and the owners of land contiguous to that water shall have the rights to use it.

Had the jury concluded that the source of the "stream" was a perched aquifer as Lewis contended, then he could rely upon "subterranean water" language of KRS 151.210(1). But because the jury on disputed facts concluded that the source of water across Lewis's property was diffused surface water, subsection (2) of that statute clearly precludes his claim. We are thus persuaded that both under statutory and common law Lewis failed to prove entitlement to damages for destruction of the "stream."

■ Lewis also insists that he is entitled to the protections set out in KRS 350.421. Again, we disagree. A reading of that statute makes clear that it was not intended to create any new rights, but merely provides an additional remedy for persons whose established water rights have been violated as a result of surface or underground coal mining.

■ Next, Lewis argues that the jury was unduly prejudiced by improper statements of defense counsel. Only two of the allegedly improper statements were the subject of an objection. The first allegedly inappropriate comment was a question to one of Mr. Lewis's witnesses about whether he had been convicted of rape and sexual abuse. After Lewis's counsel's objection to the question was sustained, no further relief was requested of the trial judge. The second allegedly improper comment occurred when counsel asked a witness if he was afraid of Lewis because of his proclivity to set fires. Again, after Lewis's counsel's objection was sustained and an admonition to disregard the question given, no request for a mistrial was requested.

In both of these instances, Lewis received from the trial judge all the relief he requested and consequently the question of the prejudicial effect of the improper comments or questions has not been preserved for our review. The court in *Curtis v. Commonwealth*, Ky., 474 S.W.2d 394 (1971), resolved a similar issue with the following analysis:

Curtis maintains that the admonition was not adequate to make clear to the jury just what was being excluded, and therefore the admonition did not remove the prejudicial effect of the answer. The question has not been reserved properly for our review. It was incumbent on Curtis, if he felt that the admonition was inadequate, to move the trial court for a further admonition or to move for a mistrial. See *Reeves v. Commonwealth*, Ky., 462 S.W.2d 926.

More recently, in *Derossett v. Commonwealth*, Ky., 867 S.W.2d 195, 198 (1993), the Supreme Court refused to review a similar issue stating:

As the trial court sustained appellant's objections to such questions and admonished the jury without such being requested, *and as appellant failed to request any further relief,* error was not preserved for appeal. *West v. Common-*

*wealth,* Ky., 780 S.W.2d 600 (1989). (Emphasis added).

The allegedly prejudicial comments or questions in issue here clearly fall within the rationale of these cases. Furthermore, examining the statements in light of the evidence adduced over the course of his two and one-half week trial, we are convinced that the isolated statements or questions do not rise to the level of palpable error.

■ Lewis's third allegation of error is that the trial judge abused his discretion in directing that Lewis pay Charolais' recoverable costs. Ky. R. Civ. P. (CR) 54.04 directs that "[c]osts shall be allowed as of course to the prevailing party unless the court otherwise directs.... In the event of a partial judgment or a judgment in which neither party prevails entirely against the other, costs shall be borne as directed by the trial court." Significant discretion is clearly afforded the trial judge under the plain language of this rule and we detect no abuse of that discretion on this case. Lewis did not prevail against Charolais on any of his claims and Charolais did prevail in its harassment claim against Lewis. Under these circumstances, Charolais could easily be classified as the "prevailing party" within the meaning of CR 54.04.

■ Next, Lewis assigns as error the refusal of the trial judge to admit evidence in the form of expert testimony as to the estimated cost of digging a replacement well. Considering the jury's determination that Charolais had no liability for the loss of water on Lewis's property, any error in the failure to admit this evidence must be considered harmless.

■ Finally, Lewis argues that the verdict on Charolais' counterclaim alleging harassment is erroneous because each of the administrative complaints filed by Lewis had merit. The jury heard substantial evidence from which it could conclude that Lewis's intent in filing these complaints was to harass or annoy Charolais because of Bowles' refusal to simply give him the property he wanted. Thus, as it was not unreasonable for the jury to conclude that Lewis's course of conduct toward Charolais constituted harassment, we find no basis upon which we could set its verdict aside.

The judgment of the Christian Circuit Court is affirmed.

ALL CONCUR.