RENDERED: AUGUST 30, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0575-MR

JAMES S. HAMILTON; AND
JAMES J. HAMILTON LIVING TRUST,
BY AND THROUGH
JAMES L. HAMILTON AS TRUSTEE                          APPELLANTS


APPEAL FROM PIKE CIRCUIT COURT
v.          HONORABLE THOMAS SMITH, SPECIAL JUDGE
ACTION NOS. 13-CI-01304 AND 17-CI-00683 (CONSOLIDATED)


P.B. STRATTON FAMILY PARTNERSHIP, LLC;
ROY ALLEN (DECEASED); BEVERLY
CHANEY; DON CHANEY; TERRY SUE
CHILDERS ALLEN; BETTY CHILDERS;
CHARLES DUDLEY CHILDERS;
RUBY COLEMAN (DECEASED); GARY
COLEMAN; T. EDWIN COLEMAN; KAREN
COMPTON; RANDALL COMPTON; ANNA
COLEMAN KINNEY; TERESA COLEMAN
PARSONS; WILLIAM PARSONS; SHELBY
FUEL CORPORATION; TERRELL COLEMAN
MARITAL TRUST; TERRY THOMPSON;
SARA THOMPSON; BECKY VENTERS;
JOHNNY VENTERS; PATRICIA CHILDERS
WATTS (DECEASED); AND PAUL WATTS                    APPELLEES

AND                              NO. 2023-CA-0577-MR


SHELBY FUEL CORPORATION                              CROSS-APPELLANT


CROSS-APPEAL FROM PIKE CIRCUIT COURT
v.          HONORABLE THOMAS SMITH, SPECIAL JUDGE
ACTION NOS. 13-CI-01304 AND 17-CI-00683 (CONSOLIDATED)


JAMES S. HAMILTON; ROY
ALLEN (DECEASED); ALLIANCE PETROLEUM
CORPORATION; CAMBRIAN COAL, LLC;
BEVERLY CHANEY; DON CHANEY;
TERRY SUE CHILDERS ALLEN; BETTY CHILDERS;
CHARLES DUDLEY CHILDERS; RUBY
COLEMAN (DECEASED); GARY COLEMAN;
T. EDWIN COLEMAN; KAREN COMPTON;
RANDALL COMPTON; DIVERSIFIED GAS 7
OIL CORPORATION, DIVERSIFIED
SOUTHERN PRODUCTION, LLC; EQT
MIDSTREAM PARTNERS, LP A/K/A
EQT MIDSTREAM SERVICES, LLC;
EQT PRODUCTION COMPANY; CELIA
AMICK GRAHAM; JAMES J. HAMILTON
LIVING TRUST; ANNA COLEMAN KINNEY;
P.B. STRATTON FAMILY PARTNERSHIP, LLC;
TERESA COLEMAN PARSONS; WILLIAM PARSONS;
PILGRIM ENERGY, INC.; TERRELL COLEMAN
MARITAL TRUST; SANDY THOMPSON; TERRY
THOMPSON; BECKY VENTERS; JOHNNY
VENTERS; PATRICIA CHILDERS WATTS (DECEASED);
AND PAUL WATTS                              CROSS-APPELLEES

AND                         NO. 2023-CA-0580-MR


PAUL WATTS; ROY ALLEN (DECEASED);
BEVERLY CHANEY; DON CHANEY;
TERRY SUE CHILDERS ALLEN;
BETTY CHILDERS; CHARLES DUDLEY
CHILDERS; RUBY COLEMAN (DECEASED);
GARY COLEMAN; T. EDWIN COLEMAN;
ANNA COLEMAN KINNEY; TERESA
COLEMAN PARSONS; WILLIAM PARSONS;
TERRELL COLEMAN MARITAL TRUST;
BECKY VENTERS; JOHNNY VENTERS; AND
PATRICIA CHILDERS WATTS (DECEASED)          CROSS-APPELLANTS



                CROSS-APPEAL FROM PIKE CIRCUIT COURT
v.          HONORABLE THOMAS SMITH, SPECIAL JUDGE
        ACTION NOS. 13-CI-01304 AND 17-CI-00683 (CONSOLIDATED)



JAMES S. HAMILTON; AND JAMES J. HAMILTON
LIVING TRUST, BY AND THROUGH
JAMES L. HAMILTON AND
AILEEN HAMILTON AS TRUSTEES                   CROSS-APPELLEES



AND                         NO. 2023-CA-0663-MR



P.B. STRATTON FAMILY PARTNERSHIP, LLC;
SANDY THOMPSON; AND TERRY
THOMPSON                                      CROSS-APPELLANTS

v.      HONORABLE THOMAS SMITH, SPECIAL JUDGE
ACTION NOS. 13-CI-01304 AND 17-CI-00683 (CONSOLIDATED)

JAMES S. HAMILTON; AND JAMES
J. HAMILTON LIVING TRUST                          CROSS-APPELLEES

OPINION AND ORDER
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND ECKERLE, JUDGES.

ECKERLE, JUDGE:  These consolidated cases comprise a complex land dispute

with deeds and patents over 100 years old.  The Trial Court likened the main

parties in these cases – the Hamiltons and the Strattons – to the Hatfields and

McCoys due to their animosity toward one another.  Indeed, the record teems with

rancor.

The main issues involve multiple parties' surface and/or mineral

ownership claims in portions of or in the whole of two tracts of land.  Underneath

these tracts are minerals worth considerable fortunes (claimed damages were in the

eight figures).  Such large stakes consumed bench and jury trials collectively

spanning some three months.  The resulting judgments do not appear to have laid

to rest much of the dispute; the parties have since filed hundreds of pages of briefs

raising over two dozen issues. After a thorough review of the issues, and after having conducted oral arguments, we find the Trial Court committed no error that warrants reversal of its orders and judgments. Hence, we affirm.

## BACKGROUND

This appeal is from two lawsuits, one filed in 2013 and one in 2017, which were ultimately consolidated prior to trial. The lawsuits encompass quiet-title actions and trespass theories on the boundary-line disputes and claims for ownership of the mineral royalties retrieved from mines and wells that were operated on the properties. The central issues address two land areas: one parcel is dozens of acres in size ("the Larger Property"); and the other is just a few acres in size ("the Smaller Property").

The parties are legion, as the overlapping and adjacent areas include hundreds of acres of land, and some of the lands have separate mineral and surface estates. Unless otherwise noted, we have grouped the parties as follows:

- **Hamiltons**: James J. Hamilton Living Trust and James S. Hamilton (hereinafter collectively, "Hamiltons");

- **Colemans**: Paul Watts, Patricia Childers Watts (deceased), Terry Sue Childers Allen, Roy Allen (deceased), Charles Dudley Childers, Betty Childers, Terrell Coleman Marital Trust, Ruby Coleman (deceased), T. Edwin Coleman, Gary Coleman, Teresa Coleman Parsons, William Parsons,

Johnny Venters, Becky Venters, Beverly Chaney, Don Chaney, and Anna Coleman Kinney (hereinafter collectively, "Colemans");[1]

- **Strattons**: P.B. Stratton Family Partnership, LLC,[2] Sara Ruth Thompson, and Terry Thompson (hereinafter collectively, "Strattons");

- **Comptons**: Karen Compton and Randall Compton (hereinafter collectively, "Comptons");

- **Shelby Fuel**: Shelby Fuel Corporation (hereinafter "Shelby Fuel"), which was mining some of the disputed properties;

- **Cambrian Coal**: Cambrian Coal, LLC (hereinafter "Cambrian"), which was mining some of the disputed properties and ultimately went bankrupt;

- **EQT**: EQT Production Company (hereinafter "EQT"), which was also involved in mineral extraction and ultimately settled with the Hamiltons prior to trial; and

- **Dismissed Parties**: Mary Francis Rowlette, Chester Rowlette, Misty Standifur, Reba Cochran, Roy Standifur, Anita Thacker, Jason Sword,

---

[1] Shortly before oral arguments in this case, the parties notified this Court that Colemans and Hamiltons had settled their disputes and moved to have their respective appeals against each other dismissed. The Court hereby GRANTS this motion. This settlement and order did not directly affect the remaining claims involving Strattons, Sandy Thompson, Terry Thompson, Comptons, and Shelby Fuel. However, it impacted parts of those claims, and thus, they will be referenced herein as needed.

[2] South Shelby Land Company was the predecessor of P.B. Stratton Family Partnership, LLC.

Phinis Thacker, James Webb, Barbara Grider, John Grider, Dave Conway, Arnold Thacker, Bethel Thacker, Betty Slone, Dover Slone, Anna Thacker, Roy Thacker, Cathy Webb, Ray Thacker, Jerline Tucker, Leroy Tucker, Cyrus Dale Huffman, Michelle Huffman, Wanda Justice, Elster Justice, Allison Cantrell, Johnny Tucker, the heirs of Lowell Huffman, and the heirs of Paris Conway (hereinafter collectively, "Dismissed Parties").

After almost a decade of litigation and discovery, the case proceeded to trials spanning a total of three calendar months: first, to a bench trial that began on October 13, 2022, and ended on November 7, 2022; and then to a jury trial, which began on November 14, 2022, and concluded with a jury verdict on December 28, 2022, the same being committed to a judgment in January of 2023. The transcripts of records from the consolidated appeals, not including depositions, comprise some 13,000 pages, including over 300 exhibits and over 40 videos. The Trial Court's Findings of Fact and Conclusions of Law, which followed the bench trial and were issued on November 9, 2022, provides a valuable summary:

FINDINGS OF FACT

In 1896 Nelson Hamilton conveyed to his son, John N. Hamilton a tract of land primarily on Rockhouse Branch of the Levisa Fork of the Big Sandy River. Nelson Hamilton did not have a surveyed description of the property but relied on natural monuments (some "permanent" and some "temporary") and surrounding boundaries to describe the tract. Significant surrounding tracts were the William Adkins 120-acre patent and the

John Dils tract, as well as the Peyton Justice patent. This deed includes the Coleman tract.

In 1898 Nelson Hamilton conveyed what by all accounts is an adjoining track [sic] to his grandson James W. Hamilton and seemed to base the description in the 1898 deed, in part, upon the 1896 deed. This 1898 deed includes the tract claimed by the Hamilton parties and is recorded in Deed Book 17, Page 90. This tract of land is the key to this entire action.

The Colemans and the Hamiltons each hold clear title to their land described in the 1896 and 1898 deeds, with title being passed down through the years by relatively clean chains of title. Both the Hamilton [sic] and Colemans presented maps prepared by Lucas Hatfield and Tim Slone, respectively, showing that both families had title to the disputed property based on the 1898 deed for Hamiltons and the 1896 deed for Colemans. Additionally, both families provided maps of the disputed properties showing a representation of the Coleman tract that fortified their claims to the disputed property. The Hamiltons presented an old map drawn or traced by Everett Johnson which agreed with Hatfield's theory of survey. The Colemans presented maps drawn by Dewey Belcher[,] a deputy county surveyor, which reflected the same shape as that proposed by Slone. Confusion ensued in the chains of title when successors to John N. Hamilton revised the tract description, going to a metes and bounds survey.

All the while, the dispute between the Hamiltons and Strattons (soon to be referenced along with Hatfield and McCoy as a great Pike County family dispute) stems from the varying interpretations of the 1898 deed boundary and that found in a boundary set forth in a commissioner's deed to Stratton predecessors P.B. Stratton and Stoney Amick dated 1924 as a result of a partition of the John Dils estate. The Strattons have consistently excepted 2 tracts from their claims. The

-8-

Peyton Justice survey and the T.M. Moore tract are excluded from the Stratton claims. These are subject to the ability to locate same.

The Hamilton-Compton portion of the case is an offshoot of the Stratton-Hamilton dispute. Compton's predecessor, Thestle Slone, received a deed from the Stratton predecessor in 1963. Subsequently, Mr. Slone passed the property on to his daughter and son-in-law via 2 deeds in 2005 and 2006, as well as a residual section of his will. Slone's daughter, Karen Compton testified that her family used and controlled the entire tract in the 1963 deed since she could remember. The most telling testimony by Mrs. Compton was regarding her first notice of a title controversy when Jimmy Hamilton told her that he owned her property. This is the best proof of any party regarding adverse possession. Jimmy Hamilton acknowledged that Mrs. Compton and her family had, in fact, met the requirements of open, continuous, exclusive, and notorious possession of the property.

Considerable time and effort were expended questioning the licenses and/or permits of Lucas Hatfield and Rick Keene to do business. The Court finds that lapses of license and permit do not affect the ability of either surveyor to prepare maps, though it would affect the admissibility of maps. However, in a case where there were maps for every occasion, the maps of two paid and biased experts were not important.

The fact that Lucas Hatfield denied that he had an opportunity to review the suspension agreement from the licensing board before he signed hurts his credibility. The fact that Rick Keene did not go on the grounds affects his import in the claims for purposes of title. (The same can be said for Tim Slone.)

Both the Colemans and the Hamiltons, in a rare moment of agreement, argue that the judge can interpret

the 1896 and 1898 deed descriptions as a matter of law. However, each side has made an argument that, in fact, leaves that matter as a boundary dispute.

CONCLUSIONS OF LAW

To paraphrase the noted title expert, Martin Osborne, "everybody has good title to something, but you must determine where it is". [sic]

The Colemans own the property in the 1896 deed from Nelson Hamilton to John N. Hamilton. The Hamiltons own the property in the 1898 deed to James Hamilton. The Strattons own the property in the 1924 Commissioners deed, with the two exceptions as noted. The Comptons own the surface tract as described in the 1963 deed to Thestle Slone both by record title and possession, as acknowledged by Jimmy Hamilton.

ORDER

Each of the three families (Hamilton, Stratton, Coleman) own property within the bounds of their source deeds. However, a jury must decide the boundaries of these properties and damages, if any, suffered by the parties.

Karen and Randall Compton own the Surface interest in the 1963 deed to Thestle Slone, both by record title and adverse possession.

Outside of this excellent summary, our Opinion could rival *War and Peace* for length if we detailed all of the evidence adduced at both trials. In the interests of judicial economy, we will provide some background information here as a measure of clarity; we will reserve for the Analysis section below some additional and necessary background information; and we will omit discussion of

-10-

some of the evidence, although we emphasize that we have taken pains to review it all when analyzing the issues herein.

We begin with a visual and note that maps were referenced during the oral argument. Five maps were submitted to the jury for the determination of the parties' boundary lines. We have replicated portions of three of those maps here, as they are helpful in understanding the disputes. We will refer to these portions of the maps as Figure 1, Figure 2, and Figure 3.

Figures 1 and 2 are as follows:



Figure 1 (above), and Figure 2 (below).



These maps depict roughly the same area; one can see Dry Fork to the north, Peyton Branch to the east, and Levisa Fork to the southwest. Figure 1 is a portion of a map prepared by Colemans' expert, Tim Slone, who outlines Colemans' claim. As a way of orienting to the parties' interests in Figure 1, one can consider Hamiltons' interest as beginning to the west of Colemans' interest, and Strattons' interest as being to the north of Colemans' interest. We caution, however, that in a trial that spanned multiple months, reducing the interests down to a sentence is inherently an oversimplification. Importantly, regarding Figure 1, Colemans averred that the left-most red line represented the eastern boundary of Hamiltons' possessory interest in the area. Hamiltons strongly disagree.[3]

---

[3] In the recent settlement, Colemans stipulated and agreed to the map that was submitted to the jury as in the Trial Court's Instructions as Map 4.

Hamiltons' expert, Lucas Hatfield ("Hatfield") prepared Figure 2, which they aver demonstrates their possessory interest in one of two possible ways. Hamiltons claim that their interest is derived from Nelson Hamilton, who acquired title to a larger property in 1873 before deeding one portion of it in 1896 ("1896 Deed") and the other portion in 1898 ("1898 Deed"). Put simply, the 1896 Deed eventually became Colemans' property, and the 1898 Deed became Hamiltons' property.

As is apparent from Figure 2, Hamiltons claim the 1898 Deed granted them much more land than Colemans claim Hamiltons possess. Hamiltons disagree with the western boundary of Colemans' interests being a north-south line from the base of the ridge straight up to what is referred to as the John Dils Line ("Dils Line"). Instead, Hamiltons believe their own property interests in their eastern boundary continue up the ridge in a northeastern direction, following the meanders, until the ridgeline meets near the Peyton Justice Survey[4] and the Dils

---

[4] "Peyton Justice" is noted on Figure 2 at the top-right corner. The jury instructions first required the jury to decide the boundaries of the Peyton Justice Survey, which lies inside portions of these properties and extends out to the northeast of Dry Fork. A portion of the survey map chosen by the jury is reproduced here:

Line, then returning southwest back down the Dils Line, allowing the Dils Line to constitute their northern border. In other words, Hatfield believed the ridgeline divided Colemans' and Hamiltons' properties. Colemans, however, believed they owned the property north of the ridgeline all the way to the Dils Line, and that Hamiltons' property interests never went east of the southwest corner of the ridgeline. The jury rejected Colemans' claim and found that Figure 2 depicted the boundary lines of Hamiltons' property.[5]

Another map, Figure 3, was also provided to the jury as follows:



[5] Again, the settlement addresses these claims.



Figure 3 (above).

Compared to Figure 2, Figure 3 adds an additional sliver of property to the north of Figure 3's solid red line, which Hamiltons claimed was another possible location for their boundaries. The jury rejected this interpretation.

For their part, Strattons claim property interests that are derived from a 1924 Court-ordered deed ("1924 Deed") that was a result of a division of the Colonel John Dils ("Dils") estate. Dils had owned or adversely possessed various

-15-

tracts of land, many of which were not contiguous, in this area, and Strattons claimed that ownership dated back to the Civil War. As Strattons note, Dils' title, including title through adverse possession, in some of the land in areas near and around the areas discussed herein, was recognized in four cases: *Dils v. Justice*, 10 Ky. 547, 9 S.W. 290 (1888); *Dils v. Justice*, 137 Ky. 822, 127 S.W. 472 (1910); *Parsons v. Dils*, 159 Ky. 471, 167 S.W. 415 (1914); and *Parsons v. Dils*, 172 Ky. 774, 189 S.W. 1158 (1916).[6] Strattons claim Dils believed he owned property "from ridge to ridge," which would mostly consume the property from the ridgeline north.

Stoney Amick ("Amick") acquired title to certain of Dils' properties pursuant to the 1924 Deed, and Amick later conveyed that interest to the South Shelby Land Company. The "William Adkins Patent" is also relevant to Strattons' interests. It is a 120-acre patent established in 1858, and it begins near the northern line of the claimed borders by Hamiltons and Colemans and extends to the north across Dry Fork. Strattons stipulated at trial that the "Dils Line" referenced in the 1898 deed to Hamiltons is located on the southern boundary of the 1858 William Adkins Patent. Strattons also conceded that they had no ownership interest south of the Dils Line, as their predecessors had sold to Colemans' heirs Strattons'

---

[6] Hamiltons disagree that these cases are relevant or cover the same properties at issue.

interests south of the Dils Line all the way to the ridgeline. Following decades of conveyances of surface and mineral interests, Strattons were ultimately left possessing only some of the gas, oil, and coal interests. Strattons also introduced other evidence attempting to prove their superior title to the land, and we elect not to detail it all here, but we do include some of it in our Analysis, *infra*.

As relates to various trespass and disgorgement claims, Strattons, Colemans, and Hamiltons had all entered into leases for the rights to mine coal from their various property interests. Strattons leased to Shelby Fuel, which later subleased to Cambrian. Colemans and Hamiltons also leased with Cambrian. Cambrian would later go bankrupt.

Hamiltons' 2013 lease with Cambrian ("2013 Lease"), referenced their deed and gave Cambrian the right to lease all of their property. The 2013 Lease also contained a dispute-resolution clause that required mining to continue in the event of a disagreement and that mandated that an escrow of royalties be held until a judicial determination could be had.

Letters written to Cambrian by Hamiltons' attorney, James L. "Jamie" Hamilton, who is also a Hamilton family member and party to this litigation as a trustee, (collectively "2014 Letters"), were introduced to the jury at trial. In a letter dated February 5, 2014, Jamie Hamilton stated:

> Please find enclosed herein a copy of our recent map
> showing the boundary lines of the property we own. The

> map attached to the lease signed on February 28, 2013
> does not include all of the property. However, if you
> would like to include the remaining portion(s) which are
> not subject to the lease, please advise.
>
> If any mining is done on those unleased areas, we are
> demanding that the royalties be paid to us commensurate
> with the terms of the existing lease.

In a later letter addressed on June 27, 2014, Jamie Hamilton[7] explicitly reiterated

that Hamiltons consented to Cambrian's mining activities:

> On or about February 5, 2014, I sent you a letter
> consenting to the mining of property which is not
> covered under the parties' current lease. I am following
> up that correspondence to provide you with a larger map
> of the area (which is highlighted) so that you are clear on
> the area that I have referred to in previous
> correspondence. The enclosed map shows the boundary
> lines of the additional property which James S. Hamilton
> and the James Jack Hamilton Living Trust are claiming
> ownership. Our surveyor should be finished with the
> final map, and a certified copy will be provided to you.
>
> Please note that the highlighted portion on the map is
> also being claimed by others. However, James S.
> Hamilton and the James Jack Hamilton Living Trust feel
> that they hold superior title and any dispute would result
> in favor of the Hamilton's [sic]. Nevertheless, we have
> no issue with royalty payments being placed into an
> escrow account as to this particular portion of property
> until the matter is resolved. This would protect all parties
> and at the same time would not hinder, delay or interfere
> with the mining process.

---

[7] Strattons introduced a third letter dated two days earlier. It contains mostly the same language as the June 27, 2014, letter; thus, we do not recite it here. Hamiltons claim it was never sent.

-18-

Again, Cambrian Coal Corporation has the consent of James S. Hamilton and the James Jack Hamilton Living Trust to mine the highlighted area on the enclosed map. We would only require that any mining on this property be under the same terms and conditions as set forth in the parties' current lease agreements.

Finally, we briefly discuss two additional groups' interests. First, as it relates to Comptons, their surface interests are detailed above in the Findings of Facts rendered at the conclusion of the bench trial. The Trial Court found that Comptons had adversely possessed the surface of several acres and entered a judgment accordingly. Hamiltons appeal this conclusion of law, as analyzed *infra*.

Second, as it relates to the Dismissed Parties, they had various claims to the Larger Property. The Trial Court issued judgment against them. No appellate issues relate to Dismissed Parties.

Following the presentation of evidence at the jury trial, the Trial Court directed a verdict in favor of Strattons and Colemans on the trespass claims, finding that Hamiltons had expressly consented to the mining activities. The Trial Court also directed a verdict in favor of Colemans on a claim for disgorgement of royalties advanced to Colemans due to unrefuted testimony that any advance royalties paid to Colemans by Cambrian had been recouped from coal taken from Colemans' other properties.

The jury then determined that Hamiltons' boundary included the Larger Property but not the Smaller Property. Accordingly, Hamiltons were

awarded royalties that Cambrian had paid into escrow, along with disgorgement of royalties received by Strattons and Shelby Fuel. A Judgment was entered that included pre-judgment interest against Colemans on the escrowed money, with the pre-judgment interest being set aside following a post-judgment motion. Hamiltons were also awarded costs, though not all costs requested, as the Trial Court found some of the costs were for duplicated and impermissible items.

As previously noted, any additional facts are discussed *infra.*

## ANALYSIS

On appeal, the parties *in toto* have raised dozens of issues and sub-issues. We have grouped the issues below to aid in the study of the plethora of complex matters. To the extent that any issue or sub-issue is not explicitly addressed, it must be noted again that we have considered it and find it to be without merit.

**I.    Did the Trial Court err in its jury instructions by not interpreting one call in one deed as a matter of law?**

We address this issue first and separately from the argument that the Trial Court erred by having a jury trial to determine the boundaries, *see* Issue II, *infra*, although the issues are extremely similar. The Trial Court's instructions to the jury included multiple maps from which the jury had to determine the correct

-20-

boundary. Colemans[8] argue that the Trial Court erred by instructing the jury in a manner that permitted a choice between various maps, which are partially shown, *supra*, as Figures 1-3. Colemans rely on the shortest-distance rule of surveying, as found in *Carter v. Elk Coal Company*, 173 Ky. 378, 191 S.W. 294, 300 (1917), to say that one call in the 1898 Deed should be interpreted as a matter of law to be a straight line. Strattons agree with Colemans' arguments as to *Carter*. However, we do not agree that *Carter* demands this result.

Strattons argue that the Trial Court erred by providing Figure 2, *supra*, to the jury in the instructions. Of the maps given to the jury, Figures 2 and 3, *supra*, supported Hamiltons. But Strattons argue that Figure 2 showed a boundary based on the flaws, lack, or weakness of title of the adversary, in contradiction to established law.

Hamiltons respond that the maps given to the jury were an appropriate representation. Hamiltons claim the straight-line method of *Carter* should not apply here. Hamiltons argue that Slone, Colemans' expert, utilized a straight-line method that required two things to be true: (1) the straight line running from the beech and pine to the top of the point must go due north (notably, the jury rejected

---

[8] Although Colemans have settled, they were present for oral argument, although they did not participate. Strattons have adopted some parts of Colemans' claims and arguments, and they were discussed before this Court. Accordingly, this Court will address them here in order to render an inclusive Opinion.

this and found the correct direction was northeast); and (2) two words in the 1898

Deed must require the straight line to be extended to the John Dils line.  Hamiltons

argue Slone's method was inaccurate.  Hamiltons claim the Larger Property is

within a tract of land acquired by Nelson in 1873, and the Dils line is a northern

boundary separating Nelson and Dils' properties.  Hamiltons note that Slone and

Hatfield agree on where the Dils' line is, and they also agree on where the Peyton

Justice Survey (largely to the east) is.  Their disagreement, according to Hamiltons,

is whether the 1896 Deed that initially split Nelson's property divided the property

in such a way to ultimately give Colemans a 100-acre tract or a 221-acre tract.

The 1896 Deed reads in relevant part, with emphasis added, as

follows:

> One boundary of land situated in Pike County KY and on
> the East side of the Levisa Fork of Sandy River in being
> a part of what is known as the Peyton Justice Farm and
> bounded as follows.  Beginning at a [black] walnut about
> seventy five yards below the mouth of what is known as
> the Rock house Branch[;] thence running a strait
> [straight] line across the bottom of a beech and pine
> above the public road[;] thence a strait [straight] line to
> the top of the point on the lower side of Rock house
> branch[;] **thence with the top of said point to John Dils
> line [on/or] to the back line of the Peyton Justice
> survey**[;]  . . . Containing about one hundred acres more
> or less.

With this language, Hamiltons argue that they agree on where the

black walnut tree and the beech and pine trees are, but they disagree on the second

-22-

call, where the line goes from the beech and pine thence in another straight line to the top of the point on the lower side of Rock House Branch. Slone runs it due north to a different location than Hatfield, who runs the line to the northeast.

Hamiltons note that a 1923 deed within the Colemans' chain of title changed the boundary description from one based on monuments to compass bearings and distances (repeated again in a 1933 deed). It provides that the boundary ran from the beech and pine on a compass bearing of N 38 E for 282.9 feet, matching Hatfield's opinion, not Slone's. Hamiltons cite Slone's admission that the 1923 and 1933 deeds do not touch his straight line and that no prior historical survey used the straight-line method for this boundary. Also, Hamiltons observe that Strattons' expert, Rick Keene ("Keene"), used the northeast line. Furthermore, Hamiltons argue that the 1896 Deed does not say that the line must go straight until it intersects the Dils Line, as it is the first call in the deed that does not say to go "strait." Instead, it says "thence with the top of said point to John Dils line *on/or* to the back line of the Peyton Justice survey." The parties disagree about whether "on" or "or" is the word written in the 1896 Deed. Slone's map requires the word to be "on" and allows the point from the Dils Line to then be a new course to the back line of the Peyton Justice Survey.

All of these arguments demonstrate that there was a multiplicity of thought and evidence regarding different interpretations and supporting the

-23-

drafting of each map.  Were the central issue presented here a sufficiency-of-the-evidence standard, we could readily hold sufficient evidence supported the jury's verdict.  But, the framed issue is whether the law supported giving the maps to the jury to decide where the boundary was.  Strattons, and Colemans before them, rely on *Carter*, *supra*, to say that as a matter of law the Trial Court should have interpreted one call in one deed as a straight line in the shortest distance to the Dils Line, ending any factual dispute about whether the line should actually follow the meanders of the ridge.  We do not find *Carter* to require this narrow result.

*Carter* presented a situation in which two corners of a patent were known monuments (in that case, trees), and the issue was the "construction to be given to the description in the patent of the fifth line," which was the line between these two corners.  191 S.W. at 296.  The *Carter* Court determined that this question was a pure question of law.  *Id*.  That Court noted, however, that it is often "difficult" to determine when a boundary dispute presents a question of law for a court or a question of fact for a jury.  It summarized thusly:

> If the issue is the correct location of a lost corner or a lost
> line, or there is a dispute as to where a corner is, or as to
> the location of a line, and this dispute grows out of facts
> that are not apparent on the face of the patent or deed,
> then the question is for the jury.

*Id*.  But *Carter*'s facts presented no such question:

> . . . in the case we have there is no dispute about the
> location of corners, nor is there any room for dispute as

-24-

> to where the line runs, because the patent as well as the plat calls for a straight line from one known corner to another known corner without any intervening corners. We again repeat that the only question in the case is: How should this line be run between the sugar tree and the sourwood?

*Id*. With no factual dispute, *Carter*'s holding was one of law.

The case *sub judice* does not present such a clean question. To ascertain all parties' interests, multiple deeds and patents are involved, along with multiple calls. The survey maps were interpretations of those several documents along with their calls and multiple temporary and permanent monuments. Additionally, there were not two obvious monuments set out as corners leaving the Trial Court only with the singular issue of how to run a line between these two monuments.

This case was not as simple as interpreting one line between two known corners. For the jury to determine the metes and bounds of who owned the Larger Property, the fact-finder had to review dozens of deeds, three historical surveys, a handwriting expert's testimony, evidence of a boundary fence that ran along the ridge, and days of expert, opinion testimony. *Carter* makes clear that the straight-line method only creates a question of law "when there was no dispute as to the corners" and the location of the line "depends entirely on the construction to be given to the description in the patent[.]" 191 S.W. at 296. As reiterated in *Carter*:

> In cases of boundary which depend upon the swearing of witnesses, it would, no doubt, be incompetent for the court, by any sort of instructions that might be given, to withdraw from the jury a decision upon the weight of the testimony and the facts which the testimony conduces to establish. The actual position and identity of the boundary in such a case would be exclusively a question of fact for the consideration and determination of the jury, and not the court.

*Id*. (quoting *Cockrell v. McQuinn*, 4 T. B. Mon. 61, 20 Ky. 61, 63 (1826)).

The case *sub judice* did not merely require the Trial Court to draw a line between two corners or known points. The parties presented a genuine, factual dispute about the location of the corners and the lines to be drawn between those corners. Accordingly, the jury was properly tendered with maps depicting those various theories to identify and determine the boundaries.

We also find unavailing Strattons' arguments that the maps were erroneously given to the jury because they were based on the weakness of title of the adversary, not the strength of one's own title. The rule has been that in ejectment actions a party "cannot prove his own title by showing that the disputed tract is not embraced in the defendant's deed" because a "plaintiff must recover on the strength of his own title and not on the weakness of his adversary's title." *Brumley v. Brumley*, 379 S.W.2d 243, 244 (Ky. 1964) (citing *Howard v. Howard*, 238 Ky. 533, 38 S.W.2d 441 (1931), and *Monroe v. Rucker*, 310 Ky. 229, 220 S.W.2d 391 (1949)). In the case *sub judice*, this legal principle for ejectment

actions is inapplicable. All parties to the instant action presented documentary and other evidence to show that they had ownership or possessory interests in the properties, and they presented multiple experts who interpreted such evidence to conclude the precise locations where the various boundaries should lie. Hamiltons presented sufficient evidence to support their claim and did not rely solely on the weakness of their opponents' deeds. Accordingly, we find no error on this ground.

## II. Did the Trial Court err by holding a jury trial on a quiet title action?

Similar to Issue I, *supra*, we also review the propriety of the Trial Court's decision to hold a jury trial in a quiet title action to determine where the boundaries lay. The Trial Court initially held a bench trial at which it determined as a matter of law that the parties had valid legal title to real property (and found that Comptons had acquired a surface interest by adverse possession). But, it determined that the actual, physical boundaries of those property lines ultimately constituted a factual dispute that a jury needed to resolve. The Trial Court's decision that a factual issue existed was due to the multiple, different surveys and interpretations of multiple deeds that used permanent and temporary natural monuments that existed over 100 years ago.

Stemming from this decision that the location of the boundary lines needed to be determined as a matter of fact by a jury, the parties have raised numerous arguments – both for and against – the central issue of whether a jury

trial was appropriate on the boundary dispute. Colemans principally argued that the plain language of the 1898 Deed controlled, Hamiltons did not own the disputed property, and that title is an issue in equity for a court and not a jury. *Al. Co. of Am. v. Frazer*, 328 S.W.2d 142 (Ky. 1958). However, Colemans appear to have now settled that issue and accepted the jury's verdict.

Nonetheless, we must note as stated above, and regarding other remaining parties to this appeal, that the law is clear on this point. Boundary disputes often involve both legal and factual questions, the latter of which requires a fact-finder (most likely a jury) to make a factual determination. For instance, Justice Palmore, writing for our Commonwealth's highest Court in *Powell v. Reid*, 519 S.W.2d 388 (Ky. 1975), determined that a boundary dispute required a jury to determine if an iron pin represented the stake originally set when the lots were laid some 25 years earlier. There, two neighbors in a subdivision had a boundary dispute. Their respective deeds called for a stake to mark off a common corner of their lots. The undisputed evidence revealed that the stakes had been replaced with iron pins after the lots were laid and before the lots were developed. Though the deeds called for a common corner pin, the plats created by the surveyors did not align:

> As usual in the instance of boundary disputes, the plats
> prepared for the respective parties do not coincide. The
> Powell surveyor found iron pins at three of his four
> corners and conformed his courses and distances

accordingly. The Reid surveyor began with a monument theretofore located during a previous survey of another lot to the north of Reid, extended a line southward along Watterson Trail, and then plotted the remaining courses and distances from that line according to the deed description without reference to or discovery of existing iron pins (if there were any) along the back or east line.

*Id*. at 389. Given this evidence, the *Powell* Court held that a jury trial was necessary to determine "whether the iron pin claimed . . . as marking the east corner of the two lots was in the same place as the stake originally set out when the lots were laid off in 1949." *Id.*

In a separate case where a party was claiming adverse possession under a color-of-title theory, our state's then-highest Court also held that a jury determination was necessary to determine the boundaries. In *Cox v. Malone*, 379 S.W.2d 735, 735 (Ky. 1964), the main issues in the case "were whether the description in the deed under which the Coxes claimed title described the boundary with sufficient certainty so that it could be surveyed, and if so, where was the boundary physically located on the ground." That Court encountered many hurdles, including the surveyor's difficulties in locating monuments and running one of the lines, the deed potentially having an incorrect call, the parties' disagreements about one of the monuments, and a dispute whether an "old fence on the hillside marked the true boundary[.]" *Id.* at 736. Accordingly, the Court determined that it was improper for the Trial Court to direct a verdict and

-29-

remanded for a new trial where the jury could determine the boundaries factually. *Id.*

In a more straightforward example, a jury's verdict was upheld for damages to standing timber where the "basic question involved was the location of a boundary line between the lands of appellant and appellee." *Harmon v. Sexton*, 343 S.W.2d 598, 598 (Ky. 1960). Much like the instant case, "[t]here were admitted discrepancies in the deeds of the parties and substantial evidence was introduced concerning the proper boundary line." *Id.*

Additional cases support submitting disputed boundary lines to juries for factual determinations of the locations. *Rice v. Shoemaker*, 286 S.W.2d 523, 524 (Ky. 1956) (where each surveyor used a different method to enclose the boundaries of a deed, "in view of the contradiction between this evidence and that of the appellants, it was proper to submit the question to the jury"); *Bell v. Stearns Coal & Lumber Co.*, 247 S.W.2d 32, 34 (Ky. 1952) ("In the case at bar a true issue concerning the correct location of the boundary lines of the various patents was joined by the pleadings and by the conflict in evidence, and we are of opinion that this issue was properly submitted to the jury."); *Holcomb v. Holcomb*, 243 Ky. 755, 757, 749 S.W.2d 1002, 1003 (1932) ("On the question of the proper location of the disputed line counsel for each side have submitted an elaborate argument. We need not detail the evidence or go further than to say that on the question of

-30-

location the evidence is conflicting, and, where that is the case, the question is for the jury and not the court."). *See also Merritt v. Palmer*, 289 Ky. 141, 145, 158 S.W.2d 163, 165 (1942) (explaining "what boundary was intended by the terms of the deed is for the court, while its identity is for the jury"). These controlling cases all support the decision of the Trial Court here.

Moreover, because there were conflicting expert opinions in the instant case, a jury was necessary to assess credibility and to determine weight. *Howard v. Kingmont Oil Co.*, 729 S.W.2d 183, 186 (Ky. App. 1987) (citing *Kentucky Power Co. v. Kilbourn*, 307 S.W.2d 9, 11 (Ky. 1957) ("Where expert testimony is conflicting, the issue becomes a question to be determined by the finder of fact . . . ."). Additionally, a portion of the dispute here involving Comptons revolves around adverse possession claims, which are fact-intensive and require assessing the credibility of witnesses,[9] and which typically are resolved through jury trials. *See, e.g.*, *Moore v. Stills*, 307 S.W.3d 71 (Ky. 2010) (jury trial on adverse possession claim, ultimately disposed of through judgment notwithstanding the verdict).

---

[9] Jamie Hamilton noted this point during oral argument before this Court, claiming that Comptons' assertions about Jimmy Hamilton's acknowledgement of adverse possession were not reliable because Jimmy Hamilton was too advanced in years to give credible testimony, and his passing statements should not be given accreditation as to whether adverse possession actually occurred.

In the case *sub judice*, the Trial Court properly reviewed the deeds, found the parties had title to real property in the area, and decided that the experts (due to their reliance on different interpretations and different methods and different locations of various monuments) could not come to a conclusion about the location of those boundaries. Thus, it properly submitted the case to a jury to determine the physical location of those boundaries. In light of established case law, this procedure was proper. Accordingly, we affirm the Trial Court's decision to hold a jury trial to make a factual finding about which physical boundaries correctly represented the various deeds. And, we reiterate that we have reviewed all arguments in favor of reversing the Trial Court's decision, including those not expressly delineated for purposes of some brevity and reject the same.

**III.    Did the Trial Court err by not permitting an attorney for one of the parties to testify?**

On August 1, 2022, EQT filed a Motion *in Limine* seeking to exclude James L. "Jamie" Hamilton, who was the designated representative of the James S. Hamilton Living Trust, from testifying at trial due to Jamie Hamilton's repeated and months-long refusals to respond to discovery requests or agree to a date for a deposition. As alluded to earlier in this Opinion, Jamie Hamilton is also an attorney who represented Hamiltons at trial (and on this appeal). EQT stated that Jamie Hamilton had been deposed by other parties, but EQT had not had the

opportunity as the parties had been in settlement negotiations, and once that process had failed, it began making the discovery and deposition requests. The parties appear to agree that the Trial Court ruled on the motion on August 4, 2022, and it did not permit Jamie Hamilton to be deposed or to testify.[10]

Hamiltons filed a motion pursuant to Kentucky Rules of Civil Procedure ("CR") 59.05 seeking to alter, amend, or vacate the August 4, 2022, ruling. Strattons opposed this motion, as did EQT. Again, there is no ruling in the certified record, but the parties appear to agree that the Trial Court continued to disallow Jamie Hamilton from being deposed or testifying.[11]

Hamiltons re-raised the issue at the beginning of the bench trial. The Trial Court again excluded the testimony. The Trial Court cited multiple reasons for excluding it, all of which concerned discovery violations, including his previous refusal to give a deposition, and none of which concerned his status as an attorney in the case.

---

[10] The docket sheet indicates that a hearing was held on that date. In the certified record, there is no video record corresponding with that date. Strattons attached an exhibit to their brief purporting to be the August 4, 2022, written order regarding this motion. It appears to contain a signature of the Trial Court, but the Clerk's Certificate is blank. Attaching documents not included in the record runs afoul of Kentucky Rules of Appellate Procedure ("RAP") 32(E)(1)(c). We choose not to impose a sanction for this violation, as we are not reviewing the ruling asserted in this document.

[11] Strattons again included in their appendix another uncertified document that is not in the certified record. We again elect not to impose any sanction because we are not reviewing the ruling in this document. RAP 32(E)(1)(c).

Hamiltons argue that the Trial Court's ruling was erroneous because Supreme Court Rule ("SCR") 3.130(3.7)(a) is a rule of professional conduct that generally prohibits an attorney from acting as both party-counsel and witness. Hamiltons note that the rule does not preclude an attorney representing a party from testifying. However, they claim it merely requires the attorney to be disqualified from representing a party if the attorney chooses to testify. Had one of their attorneys testified and been disqualified from representation, Hamiltons aver that they would simply have had other attorneys, including other Hamiltons, represent them.

Strattons respond that because Jamie Hamilton represented the James J. Hamilton Living Trust and James S. Hamilton, and he was an advocate at a trial, then he was precluded from testifying pursuant to SCR 3.130(3.7)(a). Additionally, because Jamie Hamilton had refused to appear for deposition or answer discovery, his exclusion as a witness was justified per CR 37.04(1). They also claim that the testimony was properly excluded as merely a back-door method to introduce evidence regarding a title expert that had already been excluded.

Hamiltons reply that all parties had an opportunity to depose and question Jamie Hamilton except EQT. The discovery violation was for actions Hamiltons perpetrated against EQT, and Hamiltons settled with EQT before trial.

Moreover, Jamie Hamilton had already submitted to extensive depositions over four days.

Having reviewed the proceedings and record, we hold that the Trial Court did not abuse its discretion by excluding the testimony. CR 37.04 provides a Trial Court broad authority to impose sanctions on a party if the "party or an officer, director, or managing agent of a party" fails to appear for a deposition or respond to certain discovery requests. "A trial court has wide discretion in applying the penalties provided by CR 37.04, and unless there is a clear abuse of this discretion this court will not disturb the order of the trial court." *Benjamin v. Near East Rug Co., Inc.*, 535 S.W.2d 848, 848 (Ky. 1976) (citing *Naive v. Jones*, 353 S.W.2d 365 (Ky. 1961)). Those penalties may include "such orders in regard to the failure as are just," CR 37.04(1), default judgment, *see Natural Resources and Environmental Protection Cabinet v. Williams*, 768 S.W.2d 47 (Ky. 1989), an interlocutory order dismissing without prejudice, *see Sublett v. Hall*, 589 S.W.2d 888 (Ky. 1979), and striking an answer, *see Benjamin, supra*.

Additionally, while the parties' briefs discuss the ethical implications of an attorney acting both as advocate and witness, our focus on appeal is on the Trial Court's evidentiary rulings. It is true that the Rules of Professional Conduct generally do not permit an attorney to act as both advocate and witness. SCR 3.130(3.7)(a). However, the ethical rule is "without an evidentiary counterpart[,]"

and the focus of the court system is to "decide evidentiary questions" while "leav[in]g ethical matters to the bar." *Zurich Ins. Co. v. Knotts*, 52 S.W.3d 555, 558 (Ky. 2001) (reviewing a Trial Court's order disqualifying an attorney for violating SCR 3.130(3.7)(a)). Thus, a Trial Court's decision to decline to permit testimony from one of the attorneys for a party, being an evidentiary ruling, is reviewed for an abuse of discretion. *Caldwell v. Commonwealth*, 133 S.W.3d 445, 450-51 (Ky. 2004), *overruled on other grounds by Hall v. Commonwealth*, 551 S.W.3d 7 (Ky. 2018).

In the case *sub judice*, we discern no abuse of discretion in the Trial Court's ruling to exclude the testimony. The Trial Court's final ruling was based on CR 37.04(1), not on SCR 3.130(3.7)(a). CR 37.04(1) permits a sanction for a witness who refuses to appear for deposition or answer discovery. From the record, it is apparent that Hamiltons (and, more globally, all parties) exacted a full measure of the Trial Court's patience throughout discovery and the bench and jury trials. Importantly here, Hamiltons' post-sanction decision to settle does not change the fact that they engaged in behaviors that warranted a sanction. And, more importantly, we will not permit sanctioned parties to control the manner and avoid the result of their own sanctions by simply settling with the most aggrieved parties after being sanctioned for violating Rules and Court Orders. Regardless of

the status of the victim of discovery violations, those violations nonetheless occurred, and the penalty remains.

Furthermore, our review is of the Trial Court's decision, not Hamiltons' later attempts to ameliorate their prior choices. A singular exclusion of evidence, in direct response to a party's motion, and made upon a clear showing that Hamiltons were not complying with discovery requests, fits within the wide realm of possible, appropriate responses afforded a Trial Court under CR 37.04. Accordingly, we hold that there was no abuse of discretion in this ruling.

**IV.    Did the Trial Court err by declining to permit an attorney for one of the parties to be deposed?**

Hamiltons next argue that they should have been permitted to depose David Stratton, who was president of P.B. Stratton Family Partnership, LLC, and who also was the opposing attorney who represented Strattons at trial. While opposing counsel is not typically subject to deposition, Hamiltons argue that the three-part test for permitting the deposing of an opposing attorney, set out in *McMurry v. Eckert*, 833 S.W.2d 828 (Ky. 1992), was met in the instant case. Alternatively, Hamiltons claim *McMurry* should not apply because Strattons' attorney was a material witness to key events in this land dispute.

To demonstrate that their issue is preserved for appellate review, Hamiltons in their Argument section refer only to their motions to compel. Such

minimal and general citation may meet the briefing requirement for preservation statements. RAP 32(A)(4). *See also Curty v. Norton Healthcare, Inc.*, 561 S.W.3d 374, 377 (Ky. App. 2018) (quoting *Oakley v. Oakley*, 391 S.W.3d 377, 380 (Ky. App. 2012) (noting the preservation statement must permit the appellate court to "'be confident the issue was properly presented to the trial court and, therefore, is appropriate for our consideration.'"). However, in a record that includes over 40 discs of video recordings and over a dozen boxes of transcript of record, counsel would be wise to include pinpoint citations to the video record and transcript of record showing where the Trial Court *ruled* on the motions, as our review is of the decisions of the Trial Court.

Our assessment of the voluminous record indicates that the Trial Court initially reserved ruling on the issue and later permitted Hamiltons to file a list of potential questions for an *in camera* review by the Trial Court to determine whether any of the questions related to information that would satisfy *McMurry*'s three-part test. A notice of filing is in the record, but we were unable to locate any questions that were submitted for *in camera* review. We also could not discern a ruling related to the same. Notably, Hamiltons do not cite to either, and it is not for this Court to do that work for them. Regardless, it does appear that the Trial Court ultimately did not permit the deposition to proceed.

Strattons respond that Hamiltons wanted to depose the lawyer for another party solely for speculative reasons. They claim Hamiltons believed the testimony might reveal some inconsistencies in other testimony and might also show that David Stratton encouraged Cambrian to trespass. They note that, outside of the speculation, there was sufficient evidence of written leases and agreements without requiring a party-opponent's attorney to be deposed.

Strattons further note that SCR 3.130(3.7) provides a strong basis for precluding a party-opponent's attorney from testifying, as the ethics rule would have required Strattons' chosen attorney to disqualify himself as attorney for Strattons if he were to become a witness in the case. Also, Strattons argue that the *McMurry* three-part test, which details when a Trial Court may permit the extraordinary remedy of requiring a party-opponent's attorney to be deposed and testify, cannot be met. Strattons note that Daniel Stratton was deposed, and he said that David Stratton would have the same information. Strattons aver that requiring opposing counsel to be deposed would have a chilling effect on litigation. Additionally, Strattons claim that Hamiltons cannot identify any information that they would obtain through David Stratton that they could not obtain from other sources. They noted at oral argument that in 1200 pages of transcripts, Daniel Stratton had only indicated that he did not have the information six percent of the time.

All parties are correct that our Supreme Court has adopted a rule that generally disfavors permitting a party to depose opposing counsel. *McMurry*, *supra*. A three-part test must be met by a party seeking to depose opposing counsel: (1) no other means exist to obtain the information other than to depose opposing counsel; (2) the information sought is relevant and not privileged; and (3) the information is crucial to the preparation of the case. *McMurry*, 833 S.W.2d at 830 (citing *Shelton v. American Motors*, 805 F.2d 1323 (8th Cir. 1986)). This standard presents a high bar. "In some rare or extraordinary circumstance, the deposition of counsel for a party might be necessary, but the potential for harm to the administration of justice is too great to permit such a practice routinely." *McMurry*, 833 S.W.2d at 830-31. Our review on this issue is under an abuse of discretion standard. *Id*. at 831.

Here, we can find no abuse of discretion. There were ample witnesses and evidence available to all parties without resorting to deposing opposing counsel. Notably, the trial consumed almost three months of the Trial Court's docket. The main issues regarding the boundary lines and adverse possession were thoroughly presented. The leases and letters related thereto were also provided. The information sought by Hamiltons is pure speculation. They conceded as much at oral argument, noting that they intended to ask the same questions of David Stratton that they had asked of Daniel Stratton and hoped the answers might differ.

-40-

And the critical evidence about the boundary lines largely related to events occurring prior to any of the parties' births. Most importantly, the parties had access to Daniel Stratton, who was available, who was deposed, and who testified at trial. Daniel Stratton is an attorney and a former banker, and he acted as the corporate representative of the P.B. Stratton Family Partnership, LLC. In his deposition he claimed that David Stratton would possess the same information that he had, as they were both members of this small, closely-held LLC. That Daniel Stratton was unable to recall some information or did not have answers to every question asked during his deposition may make for a good argument for the first of the three *McMurry* prongs, but it does not then make any of the speculative information sought somehow relevant and crucial. Hamiltons cite to no case law that permits the extraordinary remedy of requiring an opposing attorney to be deposed, to be disqualified, and to testify so that one party may conduct a speculative expedition for evidence.

*McMurry* applies, and Hamiltons have not met the *McMurry* three-part test. Thus, there was no abuse of discretion in refraining to permit opposing counsel to be deposed.

**V.    Did the Trial Court err on rulings on directed verdicts and judgments?**

Multiple parties claim errors with the judgments and the rulings on the motions for judgment and motions for directed verdict. Having reviewed all claims and found no error with any of them, we group them all here and discuss them collectively following a recitation of the standards of review.

As stated above, the case *sub judice* involved both a bench trial and a jury trial. Accordingly, as it relates to the bench trial, we follow the standard set forth in CR 52.01. There, "the trial court is required to make specific findings of fact and state separately its conclusions of law relied upon to render the court's judgment." *Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016). We give a Trial Court "the opportunity . . . to judge the credibility of the witnesses" and do not set aside the factual findings unless they are "clearly erroneous." *Id.* (citing CR 52.01). The Trial Court has "the exclusive province" of "judging the credibility of witnesses and weighing evidence[.]" *Barber*, 505 S.W.3d at 754 (citing *Vinson v. Sorrell*, 136 S.W.3d 465, 470 (Ky. 2004)). Though we review the factual findings for clear error, we review the conclusions of law *de novo*. *Sawyers v. Beller*, 384 S.W.3d 107, 110 (Ky. 2012).

As it relates to jury trial, a Trial Court may direct a verdict on an issue when there was a "complete absence of proof on a material issue or if no disputed

-42-

issues of fact exist upon which reasonable minds could differ." *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998). *See also* CR 50.01. In making this determination, the Trial Court must "admit[] the truth of all evidence which is favorable to the party against whom the motion is made." *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 860 (Ky. 1988). The Trial Court may not consider the credibility or weight of the proffered evidence, because "if there is conflicting evidence, it is the responsibility of the jury, the trier of fact, to resolve such conflicts." *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 215 (Ky. App. 2009) (citing *National*, 754 S.W.2d at 860).

## A. Did the Trial Court err by granting a directed verdict on the trespass claim?

Hamiltons argue that the Trial Court should not have granted a directed verdict on their trespass claim. Hamiltons assert that Strattons and Shelby Fuel are liable for a trespass committed by Cambrian because the trespass was allegedly induced by the sublease, which included portions of the Larger Property. Hamiltons claim that the Trial Court erred by granting a directed verdict based on the 2014 Letters. Hamiltons claim that the 2014 Letters gave, at best, restricted, limited, and conditional consent so long as royalty payments were escrowed; and here, they were not escrowed.

Shelby Fuel summarily responds that the Trial Court did not err because Hamiltons failed to prove that they did not consent. Shelby Fuel notes that Nathan Ratliff, the land agent for Cambrian, testified that Cambrian leased from Hamiltons all the land described in their deed. Also, Cambrian received letters from Hamiltons expressly consenting to mining.

Strattons also respond that the 2014 Letters gave express consent and reconsent to mine the area; thus, no trespass claim could be sustained. Additionally, Strattons argue the trespass claim should fail because there was a lack of proof on damages. Specifically, Strattons argue that Hamiltons failed to present evidence for a jury to determine damages for either a willful or innocent trespass.

Shelby Fuel also argues that Hamiltons did not prove damages on their trespass claim in accordance with *Harrod Concrete and Stone Company v. Crutcher*, 458 S.W.3d 290 (Ky. 2015). Specifically, *Crutcher* held that an innocent trespasser is "responsible for the value of the minerals after extraction, less the mining operation expenses that were reasonably calculated to be beneficial and productive in producing the minerals"; while a willful trespasser is responsible for remitting "an award equal to the fair market value of the minerals without any allowance for expenses." *Id.* at 299-300. But, Shelby Fuel argues Hamiltons

failed to present sufficient evidence of damages because they only introduced evidence of gross sales price, not reasonable market value.

Hamiltons reply that they presented sufficient evidence of damages, including sales prices that are presumptively market prices, and if Strattons and Shelby Fuel wanted a credit for production costs, it was up to them to introduce evidence of the same. Hamiltons further claim that Shelby Fuel has a lease through Strattons, but Strattons dropped their claim of ownership at trial and threw their support behind Colemans, and Shelby Fuel did not join Colemans as parties for this issue, which is fatal to their appeal. Notably, the jury rejected Colemans' claims and found the Disputed Property was within the 1898 Deed going to Hamiltons and not the 1896 deed going to the Colemans. At oral argument, no party explained the effect of Colemans' settlement with Hamiltons on these issues.

Hamiltons also argue the damages claim was not a basis for the Trial Court's directed verdict. In addition, Hamiltons argue that any consent given by its attorney was conditional, and no compliance ensued with the conditions. Thus, any mining was without Hamiltons' consent, and there should have been no directed verdict on the trespass claim.

At oral argument, Hamiltons failed to persuade this Court as to their lack of action in the face of an alleged trespass. Hamiltons could have sought a forcible detainer action or an injunction to remove a purported trespasser; yet, they

chose not to do so. They merely indicated that any requirement of posting a bond on such an action would pose a financial burden and was not a typical response in the industry. While this explanation may make economic sense, it still does not negate the point that they deliberately neglected to pursue these claims of trespass.

Regardless, we hold that no error occurred because the 2014 Letters explicitly granted Cambrian consent to mine. "Again, Cambrian Coal Corporation has the consent of James S. Hamilton and the James Jack Hamilton Living Trust to mine the highlighted area on the enclosed map." (June 27, 2014, Letter from Jamie Hamilton.) Conditioning that consent on "the same terms and conditions set forth in the parties' current lease agreement" does nothing to negate that in the lease explicit consent was given to Cambrian to mine the area encompassed by the deeds.

Such consent removes Cambrian from the category of trespasser. "A trespasser is a person who enters or remains upon land in the possession of another without the possessor's consent." *Bradford v. Clifton*, 379 S.W.2d 249, 250 (Ky. 1964). It is axiomatic, then, that consent completely destroys and negates a trespass claim. *Louisville & N.R. Co. v. Thompson*, 18 B. Mon. 735, 57 Ky. 735, 736 (1857) ("When an individual consents that a railroad may pass through his land, it is not a trespass for the company to enter[.]").

Because there was a complete absence of proof of a trespass, and no reasonable minds could differ on whether a trespass occurred, *Bierman*, *supra*, the Trial Court properly granted a directed verdict on this claim. Accordingly, we need not consider whether there was sufficient proof of damages.

**B. Did the Trial Court err by entering a judgment of adverse possession in favor of the Comptons?**

Hamiltons argue that the Trial Court should not have entered a judgment in favor of Comptons on their adverse possession claim. Hamiltons argue that the Trial Court erroneously based its conclusion on Comptons' testimony that Jimmy Hamilton admitted Comptons met the requirements for adverse possession. Hamiltons aver that most of the acres are wild and uncultivated and not enclosed by a fence, and no improvements were made to the disputed property. Thus, according to Hamiltons, Comptons did not actually carry their burden to show adverse possession of the whole property. At oral argument, Hamiltons also argued that Jimmy Hamilton was too aged to consent, and that his off-hand comment at a convenience mart did not constitute consent.

Comptons respond that Thestle Slone ("Slone"), the father of Karen Compton ("Karen"), acquired a deed to the property in 1963, and Karen has lived there ever since. Slone built a house and other improvements on the property since 1963. Comptons kept livestock there when Karen was a child and have hunted

there many times, and Karen would play on the hill with her brother when they were children. Comptons had Tim Malone prepare a survey map based on Slone's deed, and they argue that they have a definite claim due to color of title under the well-defined boundary in the Slone deed as shown on the Malone map. Furthermore, they claim that they proved actual possession of the whole boundary as shown by the fact that Comptons have lived on the property for decades and have gone all the way to the mountain top "all the time." Comptons note that the evidence showed they have held the property openly and in dominion to establish hostility for more than 15 years, and more than seven years under color of title. Kentucky Revised Statutes ("KRS") 413.010, 413.060.

Having reviewed the record and the arguments of parties, we find the Trial Court did not err by entering a judgment in favor of Comptons at the conclusion of the bench trial. Our review on this issue is of the bench trial; thus, we defer to the Trial Court's determination of witness credibility and review its factual findings for clear error. Here, the Trial Court found Karen Compton's testimony credible. We have reviewed it and find that it did establish all necessary elements to establish adverse possession of the surface interest.

To establish title to real property by adverse possession, "a claimant must show possession of disputed property under a claim of right that is hostile to the title owner's interest[,]" and such possession must be "actual, open and

notorious, exclusive, and continuous for a period of fifteen years." *Phillips v. Akers*, 103 S.W.3d 705, 708 (Ky. App. 2002) (citing *Tartar v. Tucker*, 280 S.W.2d 150, 152 (Ky. 1955); *Creech v. Miniard*, 408 S.W.2d 432, 436 (Ky. 1965); and KRS 413.010). Here, Karen Compton testified that she or her family had lived on the land openly and notoriously for more than 15 years. The family had a residence on the land, had substantial activity on the land, and had made improvements to the land, establishing actual possession and exclusivity. *Akers*, 103 S.W.3d at 708 (citing *Kentucky Women's Christian Temperance Union v. Thomas*, 412 S.W.2d 869, 870 (Ky. 1967); *Price v. Ferra*, 258 S.W.2d 460, 461 (Ky. 1953); and *Marsee v. Colson*, 307 Ky. 328, 210 S.W.2d 952, 953 (1948)). Additionally, she testified that Hamiltons were aware of their surface possession and had not given them permission to be there, thus establishing that the possession was open and notorious and without permission.

Therefore, the Comptons established all of the elements of adverse possession, and we must defer to the Trial Court's weighing of Karen Compton's and Jimmy Hamilton's credibility. Accordingly, we hold that the Trial Court did not err by granting a judgment in favor of Comptons on their adverse possession claim, and we affirm on that issue.

## C. Did the Jury err in its verdict regarding the 1842 boundary?

Hamiltons argue that the jury erred in its verdict regarding the 1842 boundary. This issue relates solely to the Smaller Property, and some additional background information is warranted here.

As discussed before, Nelson Hamilton had acquired the property that was ultimately split by the 1896 Deed and 1898 Deed. An 1842 deed was within that chain of title, and that particular deed provided that a boundary should run to a point on the "Madison survey" then to "the top of the highest point of the ridge that leads to the river above said Justices home[.]" Hamiltons interpret this call as placing this particular boundary corner north of the Dils Line, thus requiring that Nelson Hamilton's property interests included a few acres that Strattons claim. Hamiltons claim that if Jamie Hamilton had been permitted to testify, *see* Issue III, *supra* (holding that the Trial Court did not err by excluding this testimony), he could have explained the location of the highest point referenced. Hamiltons argue there was an "Augment" clause of James W. Hamilton, Jr.'s 1898 deed, which provided that he was to receive all of Nelson Hamilton's property below the land that he conveyed to John Hamilton, which would include the Smaller Property. But, Hamiltons claim the jury was erroneously precluded from hearing their Jamie Hamilton's testimony about the Augment clause. Hamiltons do concede, though, that Hatfield offered testimony about this line, but they claim that Jamie Hamilton

would have also supported this testimony. They ask that we remand for retrial on the Smaller Property so as to permit this additional testimony and see what verdict a jury might entertain as a result.

Strattons respond that the Trial Court did not abuse its discretion by refusing to permit Hamiltons' attorney to testify about the 1842 deed. Hatfield already testified about this information. Also, Jimmy Hamilton, Jamie Hamilton's father, did testify at trial and could have testified to the same. Further, expert testimony was given about these lines, especially Slone's showing the property lines. Finally, Strattons claim Jamie Hamilton merely wanted to testify about other expert opinion that had already been excluded.

Having reviewed the evidence, we hold that there was sufficient evidence to support the jury's verdict regarding the boundary lines. Hamiltons' argument is largely based on evidence that might have been, but was not, admitted. Of the evidence that was admitted, though, we cannot state that the jury's verdict "is so flagrantly against the weight of the evidence as to indicate passion or prejudice." *Denzik v. Denzik*, 197 S.W.3d 108, 110 (Ky. 2006) (citing *Bierman v. Klapheke*, 967 S.W.2d 16 (Ky. 1998)). And the additional, proffered evidence was cumulative. Accordingly, we do not reverse the ruling of the Trial Court or the verdict of the jury on this issue.

**D. Did the Trial Court err by not granting judgment as a matter of law to Strattons as to ownership of the Larger Property?**

Strattons argue that their chain of title was unblemished, and they were entitled to judgment as a matter of law regarding ownership of the Larger Property. Even the mineral rights to land can be acquired by adverse possession because of penetration of the subterranean structure by a gas well. In the 1934 lawsuit between South Shelby Land Company and James W. Hamilton, Strattons set out in their verified complaint that Dils and Nelson Hamilton agreed prior to 1895 that the boundary was to be the top of the ridge, not into Dry Fork, which would belie Hamiltons' current claims.

Hamiltons disagree. They detail that Strattons abandoned any claim to the Larger Property at the trial. They did not even put forward an expert showing they had a claim to it. In lengthy detail, Hamiltons argue how they believe the *Dils* cases, which Strattons rely on as part of their chain-of-title evidence, have nothing to do with the Larger Property. Hamiltons also offer numerous other arguments refuting Strattons' claim.

As we have already held, the Trial Court did not err by holding a jury trial on the boundary issue, nor by giving the maps to the jury to make a determination about the boundaries. Strattons' claim, then, is more appropriately an issue of whether there was sufficient evidence to support the jury's verdict. We

-52-

hold that no error occurred. The Trial Court properly held that each party had established title to properties in the area and permitted the jury to determine the boundaries of said areas due to numerous issues with finding the boundaries on the ground. The evidence introduced supported the jury's verdict. Accordingly, we affirm on this issue.

**E. Did the Trial Court err by not granting a judgment as a matter of law to Strattons as to the ownership of the subject gas well?**

Strattons argue that they were entitled to a judgment as a matter of law as to adverse possession of a gas well on the disputed property. They claim that Hamiltons made a judicial admission in their closing arguments that they were not claiming the gas well. Additionally, they owned the well by adverse possession for at least 15 years, during which time Hamiltons knew about the well. The well was drilled on December 2, 1998, more than 15 years before Hamiltons' claims were filed. It was in a visible spot, mowed, with a road to it, and marked with a sign with nothing blocking a person from seeing it. Thus, Strattons claim it was open and obvious.

Hamiltons argue that there was no adverse possession. They note that their "judicial admission" was simply a reality – the well was not on Hamiltons' property, but it was within 500 feet of the property, which carries with it statutory implications against adversely possessing the neighboring property. KRS

363.610(2). Furthermore, the jury found against Hamiltons as it relates to the gas well on the Smaller Property. Hamiltons also note that there is no evidence that there was continuous production for 15 years to establish adverse possession.

Having reviewed the record, we find this claim to be meritless. There was no judicial admission, and there was sufficient evidence to support the Trial Court's decision. Accordingly, we affirm on this issue.

### F. Did the Trial Court err by declining to award all recoverable costs?

Hamiltons next argue that the Trial Court erred by failing to award all recoverable costs. Specifically, under CR 54.04, the Trial Court only permitted Hamiltons to recover originals of a deposition in the form of a video or a transcript, but not both, and also only for the depositions they set. The Trial Court refused costs of expert witness fees, and copies of depositions including e-transcripts, videos, condensed transcripts, and the like. Hamiltons note that unpublished opinions of our Court have required reimbursement for the attorney who sends the notice of deposition. Hamiltons also take issue with having to submit new invoices with itemized charges when the original invoices had no such itemization and would not have required a reduction in recoverable costs.

Strattons[12] respond that the Hamiltons voluntarily incurred costs above the typical costs of litigation, including duplicate transcripts and copies of the same depositions, expert witness fees, costs for additional e-transcripts, and costs for copying various exhibits. They note that over $20,000 were spent for unspecified deposition costs that exceed permissible amounts, and over $10,000 were dispersed for duplicative video copies of depositions and of depositions of individuals having nothing to do with Colemans' claims. Strattons also note that fees paid to experts are not recoverable as costs, citing *Brookshire v. Lavigne*, 713 S.W.2d 481 (Ky. App. 1986), unless authorized by statute.

We have reviewed the Trial Court's proceedings and rulings on this issue and hold that there was no abuse of discretion. Under CR 54.04(1), costs are "allowed as of course to the prevailing party unless the court otherwise directs[,]" and "as directed by the trial court" when there is a partial judgment "or a judgment in which neither party prevails entirely against the other[.]" "Significant discretion is clearly afforded the trial judge under the plain language of this rule[,]" and we review the Trial Court's ruling on costs for an abuse of discretion. *Lewis v. Charolais Corp.*, 19 S.W.3d 671, 677 (Ky. App. 1999). Pursuant to the Rule, the

---

[12] Actually, Colemans made these arguments originally, but Strattons agreed with and adopted them.

party seeking costs shall prepare an itemized bill of costs incurred for, among other items, "costs of the originals of any depositions[.]" CR 54.04(2).

We are directed to no published support for the proposition that CR 54.04 requires a Trial Court to award costs for multiple copies of depositions in multiple modalities as Hamiltons requested. Indeed, unpublished case law, as Hamiltons point out, would not even support their position. *See generally Helm Co., LLC v. Humana Ins. Co. of Kentucky*, No. 2013-CA-001613-MR, 2014 WL 4802918 (Ky. App. Sep. 26, 2014). But we need not review the unpublished case law, as CR 54.04 permits the Trial Court "[s]ignificant discretion" under the "plain language of this rule[,]" and our review of the case *sub judice* reveals that the Trial Court did not abuse that significant discretion by permitting substantial costs and denying certain other costs for copies. Accordingly, we affirm on this issue.

### G. Did the Trial Court err by not permitting the individual partners of the P.B. Stratton Family Partnership to be added to the case?

Hamiltons next argue the Trial Court erred by denying its motion to dismiss Strattons' complaint because the individual partners of the P. B. Stratton Family Partnership ("the Partnership"), which had been converted to the P. B. Stratton Family Partnership, LLC ("the LLC") in 2017, were not named parties. Hamiltons had argued in their motion to dismiss that the members of the

Partnership were indispensable parties to the action, and without them the LLC lacked standing in the suit. The Trial Court denied the motion to dismiss and permitted the LLC to continue without the Partnership's former partners being named as individual parties.

Strattons primarily respond that the issue is largely moot because the LLC has already paid the amount of judgment entered against it. Additionally, they respond that the Trial Court properly denied the motion to dismiss because the converted LLC took on the property and obligations of the Partnership, thus giving it standing to continue in the suit.

Indeed, the Partnership was created in 1982 and converted to an LLC in 2017 pursuant to KRS 275.370. Citing to *Lach v. Man O'War*, 256 S.W.3d 563, 568 (Ky. 2008), Strattons note that the Partnership was not dissolved or terminated, just converted, and all property owned by the Partnership remains vested in the LLC, and all obligations of the converted Partnership are now the obligations of the LLC. Strattons respond that Hamiltons' argument ignores KRS 275.375(2), which reads in relevant part:

> (2) When a conversion takes effect:
>
> . . .
>
> (c) An action or proceeding pending against the converting partnership or limited partnership may be continued as if the conversion had not occurred and the name of the converted limited liability company may be

substituted in any pending action or proceeding for the name of the converting partnership or limited partnership[.]

We agree that no error occurred when the Trial Court did not grant the motion to dismiss. It appears that there was a conversion of the partnership into an LLC, and, accordingly, all property and obligations were converted as well. KRS 275.375(2)(a)-(b). The pending action was then continued in the name of the LLC. KRS 275.375(2)(c). The LLC was the proper party to bring the suit, not the members of the LLC. *Cf. Turner v. Andrew*, 413 S.W.3d 272 (Ky. 2013). And the LLC did not have to name the partners of the Partnership to maintain the existing suit. Accordingly, we affirm on this issue.

## CONCLUSION

For the foregoing reasons, we hold that no reversible error occurred in the instant case. Furthermore, any issues raised by the parties and not expressly discussed above have been considered, and we hold that they do not constitute meritorious claims. Accordingly, we AFFIRM the judgment and orders of the Trial Court appealed from in the instant case. We GRANT the motion to dismiss the Colemans and Hamiltons as set forth more fully herein, *infra*.

ALL CONCUR.

ENTERED: _August 30, 2024___        _____

                                                    JUDGE, COURT OF APPEALS

-58-

BRIEFS AND ORAL
ARGUMENT FOR
JAMES J. HAMILTON
LIVING TRUST:

David T. Faughn
Richard A. Getty
Lexington, Kentucky

BRIEFS FOR
JAMES S. HAMILTON:

James L. "Jamie" Hamilton
Jonah L. Stevens
Pikeville, Kentucky

BRIEFS FOR KAREN COMPTON,
RANDALL COMPTON, AND
SHELBY FUEL CORPORATION:

James P. Pruitt, Jr.
Pikeville, Kentucky

BRIEFS FOR PAUL WATTS,
PATRICIA CHILDERS WATTS
(DECEASED), TERRY SUE
CHILDERS ALLEN, ROY ALLEN
(DECEASED), CHARLES DUDLEY
CHILDERS, BETTY CHILDERS,
TERRELL COLEMAN MARITAL
TRUST, RUBY COLEMAN
(DECEASED), T. EDWIN
COLEMAN, GARY COLEMAN,
TERESA COLEMAN PARSONS,
WILLIAM PARSONS, JOHNNY
VENTERS, BECKY VENTERS,
BEVERLY CHANEY, DON
CHANEY, AND ANNA COLEMAN
KINNEY:

Anna Stewart Whites
Frankfort, Kentucky

BRIEFS AND ORAL ARGUMENT
FOR P.B. STRATTON FAMILY
PARTNERSHIP, LLC, SARA
THOMPSON, AND TERRY
THOMPSON:

Scott M. Webster
London, Kentucky

David Stratton
Pikeville, Kentucky